08 C 1097

**JUDGE KOCORAS**
**MAGISTRATE JUDGE SCHENKIER**

# EXHIBIT B

# NATIONAL ASSOCIATION OF SECURITIES DEALERS, INC.
# DIVISION OF ARBITRATION

In the Matter of the Arbitration Between: §
§
ROBERT SAM JR. AND KAREN K. AUKSI-SAM, §
INDIVIDUALLY AND ON BEHALF OF THEIR §
ROTH IRAS, SEP IRA AND NORTH STAR §
BASEMENTS, INC. §
                Claimants, §
§
Vs. §     NASD-DR #
§
EDWARD JONES §
                Respondent. §

NASD Dispute Resolution, Inc.
RECEIVED
JUL 0 5 2006

# CLAIMANTS' ORIGINAL STATEMENT OF CLAIM

TO THE HONORABLE MEMBERS OF THIS ARBITRATION PANEL:

## I. PARTIES, JURISDICTION, VENUE, AMOUNT IN CONTROVERSY

(1) Claimants, Robert J. Sam, Jr. ("Robert") and his wife Karen K. Auksi-Sam ("Karen") on behalf of their IRAs and North Star Basements, Inc. ("North Star") - (collectively, "The Sams" or "The Claimants"), are public investors and current residents of Orland Park, Illinois. Claimants complain of acts by Respondent Edward D. Jones & Co., L.P. ("Edward Jones"), a member firm of the National Association of Securities Dealers, Inc. ("NASD"). As **PUBLIC INVESTORS**, Claimants invoke the jurisdiction of the NASD, Division of Arbitration, to have this claim for an aggregate between **$1,000,000 to $3,000,000**, plus interest and costs, heard before a **PANEL OF THREE (3) ARBITRATORS** in **CHICAGO, ILLINOIS**. Claimants request this matter be put on the "fast track" due to Claimants' compromised financial condition

## II. SUMMARY OF CLAIM

(2) This case is not about losses in the securities markets. This is about Respondent's bad acts in handling Claimants' business checking account. Claimants, Robert Sam, Jr. and Karen Auksi-Sam are a hard-working, young married couple in their late 20s living in Orland Park, Illinois. The Sams recently started their own general contractor business – a long time dream of Robert's – and have been running it successfully for about a year. In January 2006, Claimants were solicited by the Respondent to deposit both their personal and business accounts with Edward Jones. The Respondent convinced the Sams that they would receive better service and receive better returns on their money if it were deposited with Edward Jones instead of with their bank. Relying on Respondent's advice, the Sams transferred the majority of their assets out of their bank and placed them with Edward Jones.

(3) They opened a money market account with Edward Jones and used it to manage their general contractor business. In addition, Edward Jones convinced them to start a Simplified Employee Pension Plan Individual Retirement Account (SEP IRA), as well as two personal Roth IRAs. For several months, the Sams used their money market account without incident to carry out the ordinary transactions necessary to successfully conduct their business. However, in May 2006, they encountered significant and crippling problems. Without any notification or explanation given to the Sams, Edward Jones closed their business account and froze their personal assets, even though there were sufficient funds in the account at the time. This closure essentially shutdown their ability to conduct business. Yet, the Sams only became aware of this closure when they began receiving angry messages from their clients and employees stating that their checks were being returned, stamped "Account Closed." (Edward Jones never contacted them about closing their account before it impacted their business operations.) The Sams immediately contacted their Edward Jones representative, Rick Powell, to inquire the reason for the account closure and how they could correct it as quickly as possible. Mr. Powell provided them with little information and even less support, merely telling them that Edward Jones had felt that their account was a risk. The Sams then tried to withdraw their money from the account, in order to salvage their business transactions, but Edward Jones would not release it.

(4) The Sams then tried to contact various other representatives within Edward Jones. They repeatedly called the Edward Jones Branch Office, the Edward Jones Compliance Department, and even one of the head Partners of Edward Jones, pleading with them to explain how the problem could be resolved. But the Sams received little response from anyone within Edward Jones.

(5) Since then, the Sams have lost their hard-earned business. Clients and vendors have threatened the Sams with breach of contract lawsuits, they have lost valuable sub-contractors, ongoing jobs and perspective customers no longer want to do business with the Sams. Moreover, the Sams have lost significant face within the general contractor community. Through its negligent actions, and subsequent fraudulent acts, Edward Jones has greatly defamed the reputation of the Sams, both personally and professionally. As a result of Edward Jones' negligence, defamation, breach of contract and breach of fiduciary duty, **the Sams have lost in excess of $1,000,000.**

## III. FACTS OF THE CASE

(6) Robert Sam and Karen Auksi-Sam, both 28 years-old, and live in Orland Park, Illinois. Robert served his community both as a firefighter and as a police officer. He spent several years working in these public service positions, hoping to earn enough money to pursue his dream of owning a construction company. Eventually, he had enough savings to start Symphony Builders, a general construction company. Robert and Karen worked extensively to build up Symphony Builders.

(7) Karen helped support the family and business by working for PCF Company, a customer relations firm. After 3 years of successfully running Symphony Builders, they decided to steer their company into a more specialized area within the construction industry. They closed down Symphony Builders and started Northstar Basements, Inc., a custom basement remodeling company. The success of Northstar looked promising. The Sams felt that Northstar was now capable of being the sole support for the Sams family. Karen was able to quit her job and pursue her own goal of becoming a hair stylist. She had begun attending Trend Setters College of Cosmetology and had completed 4 months before they encountered their financial problems with Edward Jones

(8) In December 2005, Karen Auksi-Sam decided that some Microsoft stocks would make a nice Christmas gift to Robert. She went to the local branch office of Edward Jones in Orland Park, Illinois, primarily because of the name recognition and status as an investment firm. She met with Rick Powell, Edward Jones' local investment representative, who helped her purchase the stock. After receiving the gift of stock from Karen, Robert went into Edward Jones to meet with Rick Powell in order to learn how this gift would actually work. During that discussion, Powell asked Robert questions about his current personal and business financial setup. Upon learning that the Sams only used standard bank accounts to manage their money, Powell convinced Robert that their money would be better off with Edward Jones. Powell explained how they could receive better service and better returns on their money with Edward Jones. Powell also explained how SEP and Roth IRAs worked. Powell promised that Edward Jones would always keep the Sams informed about their account status, update them on potential stock opportunities, and help the Sams upgrade their Roth IRA accounts as needed. Powell guaranteed Robert that money market accounts would always do well and were the smart way to go for managing a business, and most importantly, that the check writing capabilities functioned like a standard checking account at a bank.

(9) Relying on the promises made by Edward Jones' representative, the Sams decided to transfer most of their monies from their bank accounts at LaSalle Bank into their new accounts with Edward Jones. They opened a corporate money market account under the name of Northstar Basements, Inc., a joint personal money market account, a personal Roth IRA account for each of the Sams, and a Simplified Employee Pension Account.

(10) The Sams used their corporate account at Edward Jones for four months to carry out the financial needs of their business. On May 15th, 2006, around 3:30 in the afternoon, Robert went into the local Branch Office of Edward Jones to make what he would later realize, his last business deposit (see attached.) He made the deposit through Victoria Karr, Rick Powell's secretary, and received a deposit receipt from her. At that time, no one from Edward Jones notified Robert in any way that there was a potential problem with any of his accounts. Acting under the assumption that everything was fine with his Northstar business account, Robert continued to write checks to customers, employees and various vendors from this account. Then, about a week later, Robert discovered that there was a problem with the account when he began to receive irate phone calls and complaints from customers and employees who had been unable to cash their checks. The checks were returned to them stamped, "Account Closed."

(11) Bewildered, Robert immediately contacted Rick Powell, the local branch manager of Edward Jones, to figure out what had gone wrong. Powell informed him that Edward Jones had closed his business account because they considered the account to be a risk. Robert asked Powell what he could do to rectify the situation so that he could continue to run his business, but Powell and Edward Jones were unresponsive. Moreover, when Robert requested that Edward Jones at least give him the money that was in his account, Powell said that Edward Jones would **not release the money** until all of the checks that Robert had written be turned in to them. Robert tried to reach the Edward Jones Compliance Department, leaving a detailed message and a return phone call, but never heard from them. (Note: Respondent has the right to terminate relationships they have with their clients, however, according to the customer agreement, they MUST give notice. A consumer has a reasonable expectation that when checks are written with available funds, the checks will be processed and more so, in a business account. It is one thing to negligently fail to send out notice to the client that the account is being terminated but it is far worse when a financial institution fraudulently tries to cover its error(s).

(12) Shortly thereafter, Robert, desperate at this point, returned to the Orland Park branch of Edward Jones to speak with Rick Powell again, hoping that he would help. Powell told Robert that the matter was "out of his hands" and in addition, notified Robert that Edward Jones had frozen his Roth IRA as well. Later, Karen found out that her Roth IRA had also been frozen and inquired when they could expect to receive their monies. Edward Jones had completely blocked their access to any of their finances and gave them no explanation as to why it had been done nor gave them any indication as to when or how the matter would be resolved. The Sams were left out in the cold by Edward Jones. They were not even allowed to access their own money in the checking account so that they could mitigate the damage done by Respondent.

(13) Robert next attempted to contact a higher authority at Edward Jones. On May 22nd, he left a phone message with Jim Weddle, one of the head partners at Edward Jones. Not surprisingly, Weddle did not return the call. Then, Robert tried contacting Weddle at home after he gained Weddle's home phone number from a sympathetic Edward Jones employee. Robert spoke with Weddle's wife who said that she would have Weddle call him. But Weddle did not return the call. Finally, one of Robert's former employees who desperately needed her paycheck called Weddle at home. This time Weddle's wife snapped at the employee and said, "This happens all the time, so do what you gotta do."

(14) At this point, Robert and Karen were panicked and not sure what further action they could take. Finally, the Edward Jones compliance department returned Robert's call. Robert was contacted during the last week of May by Sherry Wilson, an Edward Jones compliance officer, who took down all of Robert's information and told him that Edward Jones would get back with him. (Robert has not heard from them in over a week.) Finally on June 2nd, three weeks after the account was closed, another compliance officer, Jeremy Michaelman, contacted the Sams. He gave no explanation as to why their account had been closed but told them that they would be receiving their money soon. After several weeks, The Sams finally received their checks from Edward Jones. Edward Jones claims these amounts are from the sale of the corporate money market account and cash that was left in the account. The Sams believe that it should be higher. However, it has been impossible to get any explanations from Edward Jones. Regardless, at this point, the damage to the Sams, personally and professionally, has been done.

(15) Respondent demonstrated a "mean" spirited attitude towards their clients in the handling of this matter. Every attempt at resolution was stymied by Edward Jones. They simply strung the Sams along, abandoning their clients and their duties. Finally on June 22, 2006, Respondent provided a purported explanation, they state that the account was closed because there were too many NSF checks. (It should be noted that no checks were ever returned.) Respondent is within their right to cease doing business with the Sams. Their motive for ceasing to do business with the Sams is a reasonable one. However, the manner in which they carried out the closure was unreasonable, illegal and possibly immoral. A bank cannot close a checking account without notifying the client who obviously, or in great likelihood, have outstanding checks. Standard business practice and Edward Jones' own account agreement mandates that "reasonable" notice be given . Respondent has the audacity to state, in writing, that they did give notice. Respondent's agent, Mr. Powell, purports to have called the Sams on May$15^{th}$, 2006, and says that he notified the Sams that their checking account was being shut down that very day! The Sams never received such a phone call, but even if this questionable assertion were true, it would not be "reasonable" notice to close an account. Furthermore, that was the very day that Robert Sam made his last deposit. Respondent accepted the deposit on May 15, 2006 and the $5,000 cleared and was credited to the business account.

(16) Edward Jones' written response provides no reasonable answers. Instead, they belittle their already downtrodden former clients by attacking them for writing post-dated checks. (Attached is a letter from a business associate of the Sam's who mistakenly deposited a post-dated check written earlier in May.)

(17) Unable to access his company's money, Robert could not complete jobs for his customers nor could he pay his employees. He began to lose both his current customers as well as potential customers in addition to his valued employees. He has lost thousands of dollars in customer contracts and his construction business has been destroyed. Moreover, the multiple returned checks have annihilated his credibility within the construction community. Each time Respondent stamped a check "Account Closed" it constituted a separate act of defamation. In addition, Robert and Karen were unable to pay their personal bills since Northstar was their sole means of support. Karen was forced to drop out of her Cosmetology classes because they could not pay her tuition. Also, the Sams were unable to pay the rent on their house and are now facing eviction. They had recently found their "dream house" but are now unable to go through with the closing, and they face the possibility of a lawsuit from the sellers for the full amount of the purchase contract.

(18) Through their negligent and reckless/fraudulent conduct, breach of contract, breach of fiduciary duty, defamation, and tortuous interference with business relationships, Edward Jones destroyed the Sams livelihood. The Sams have lost everything that they have spent years working hard to achieve. Edward Jones entered into an account agreement with the Sams and then breached the agreement. Most specifically, the Edward Jones Account Agreement states that Edward Jones may terminate the account at any time. However, in order to terminate, Edward Jones must notify the account holder of the termination. Edward Jones and its representatives failed to notify the Sams that it had decided to close their account, knowing full well that this account was used by the Sams to run their business. Accordingly, the Sams continued to operate as if their account were in good-standing and did not have any opportunity to resolve the issue before it caused severe damages to their business. Respondents offered their services as advisors but did not provide such services as represented. Respondents engaged in misrepresentations, omissions, and other intentional, negligent and/or grossly negligent behavior. Respondents breached their fiduciary duties to Claimants and did not exercise good faith and fair dealing with them. Respondents violated various statutes prohibiting such activities, including applicable NASD standards. Respondents entered into agreements with Claimants, then breached those agreements. All such conduct by Respondents, both by commission and omission, were fraudulent, knowing, intentional, reckless, and/or negligent, and were the producing and/or proximate cause of the damages as sought herein.

## IV. CLAIMS FOR DAMAGES

### A. BREACH OF CONTRACT AND WARRANTIES, PROMISSORY ESTOPPEL

(19) As herein described, Respondent breached the terms and conditions of their agreements and contracts with Claimants, written and oral, express and implied, and are liable to them for the damages caused by all such breaches according to the laws of the State of Illinois, including any applicable banking laws and consumer protection laws, and other applicable states' laws. Respondents have contracted with regulators, including the NASD, to follow the regulations set forth to protect the public, including these Claimants, but breached these agreements causing harm to Claimants, the intended beneficiary of such agreements.

(20) As herein described, Respondent breached warranties owed to Claimants; both expressed and implied, and are liable to them for the damages caused by all such breaches.

(21) As herein described, Respondent made representations to Claimants, upon which they relied to their detriment, and are therefore estopped to deny such representations.

### B. FRAUD

(22) As herein described, Respondent violated relevant provisions of the Illinois fraud statutes, including any applicable banking laws and consumer protection laws, and the principals of common law fraud, and are liable as well under corresponding legislation of any and all other states which may be considered applicable in this matter, such acts being committed intentionally and/or recklessly. Specifically in the cover up of Respondents' initial breach of duties as described above and below. Claimants therefore seek all relief which may be available to them under such legislation, including rescission and/or damages.

### C. CLAIMS UNDER COMMON LAW

(23) As described above, Respondent is liable for their tortuous interference with the business relationships of the Claimant and all resulting damages stemming from this interference.

(24) As described above, Respondents' actions were an invasion of Claimant's privacy by publicity that unreasonably placed Claimants in a false light before the public. Therefore, Respondent is liable for the resulting harm to the Claimants.

(25) As described above, Respondent assumed a trust and confidence relationship with Claimants as fiduciaries, and then breached that fiduciary duty, as well as their duty to Claimants of good faith and fair dealing.

(26) As described above, Respondent intentionally, negligently, gross negligently and/or with reckless disregard harmed Claimants' persons and/or property, including causing injury to the Claimants' reputation within the community.

(27) Respondent and its agents participated together in concert to accomplish all such acts which together harmed Claimants; this conspired to cause damages to Claimants.

(28) As described in the preceding paragraphs, Respondent proximately and otherwise caused damages to Claimants, including lost assets, lost opportunities, consequential losses, injury to reputation and injury to their person and/or property, including mental anguish and emotional distress. Respondent is thus liable under the laws of Illinois, and the corresponding laws of any and all other states which may be applicable to this matter, for all such damages to Claimants.

## V. DEFAMATION

(29)  As herein described, the Respondent defamed the reputation of the Claimants. The actions of the Respondent caused significant harm to the Claimants' reputation within the community and have deterred third persons – ie., customers, vendors and potential employees – from associating or dealing with the Claimants. Therefore, Claimants seek damages under the common law grounds of defamation.

(30)  Under Illinois common law, defamation per se is applicable where words impute an inability to perform or want of integrity in the discharge of duties of office or employment, and/or where words prejudice a party, or impute lack of ability in his trade, profession or business.

(31)  As described above, Respondent's actions led third parties to question Claimants' ability to perform their business duties, Claimants' integrity in performing those duties, and imputed that Claimants' lacked ability in his business.

(32)  Therefore, Respondent is liable under the laws of Illinois, and the corresponding laws of any and all other states which may be applicable to this matter. Respondent should be held liable for every act and for any and all damages produced in any manner to Claimants.

## VI. VICARIOUS LIABILITY

(33)  During the time of the acts of Respondent which harmed Claimants, Powell and the personnel at the Orland Park, Illinois office branch of Edward Jones were agents of, employed by and had actual and apparent authority to represent Edward D. Jones & Co., L.P.  Therefore, Claimants invoke the doctrines of agency liability, "respondeat superior" and vicarious responsibility of Respondent for acts of their agents/employees.

(34)  Furthermore, the officers, directors and supervisory agents of Respondent have both statutory and common law duty of responsibility for, and of supervision over, and maintained and exercised control over these persons and their actions.

(35)  Respondent and its agents acted together in concert to cause damages to Claimants, each committed all or part of the above-described acts which caused harm to Claimants and each aided and abetted other Respondents in the commission of those acts.

(36)  Therefore, Respondent is liable under Federal legislation and under the laws of Illinois, and corresponding laws of any and all other states which may be applicable to this matter. Respondent should be held liable for every act and for any and all damages produced in any manner to Claimants.

## REQUESTS FOR RELIEF

WHEREFORE, Claimants seek that an award be entered ordering Respondent Edward Jones to pay to Claimants an amount of between One Million and Three Million dollars, including all direct and/or consequential damages and statutory and/or punitive damages, plus interest and costs, an amount which Claimants reserve the right to amend at any time including during hearings held on these matters, as follows:

(A) All lost opportunities incurred as a result of acts and/or omissions; plus, additionally or alternatively,

(B) Damages for interference with business opportunities, plus interest from the date of the breach until date of award; plus, additionally or alternatively,

(C) All economic and presumed damages as a result of defamation and injury to reputation; and, additionally or alternatively,

(D) Statutory damages as provided by applicable law; plus, additionally or alternatively,

(E) Damages to Claimants as a result of mental anguish; and, additionally or alternatively,

(F) Punitive damages in an amount that the Panel shall deem appropriate; plus,

(G) Pre-award interest on all sums awarded computed at the maximum rate allowed by applicable law; and post-award interest on all sums awarded, including while on appeal, if any, computed at the maximum rate allowed by applicable law; plus,

(H) Legal fees and costs of these proceedings computed at the maximum rate allowed by applicable law; and post-award legal fees and costs, including while on appeal, if any, computed at the maximum rate allowed by applicable law; plus,

(I) Any and all other relief available to Claimants, in law or equity or otherwise, which may be granted by this Arbitration Panel.

Respectfully submitted,

**SHEPHERD, SMITH & EDWARDS, LLP**
**ATTORNEYS AT LAW**

By: _/s/ Kirk Smith_
KIRK GEORGE SMITH
1010 Lamar St., Suite 900
Houston, Texas 77002
Telephone: (713) 227 - 2400
Facsimile: (713) 224 - 7911
**ATTORNEYS FOR CLAIMANTS**

To Kirk Smith.

From Liam O. Connor @ Ross Castle of Stirly Ridge

**Edward Jones**

## DEPOSIT RECEIPT

DEPOSIT DATE:   5/15/06

ACCOUNT NUMBER: 585-09976-1-9

INVESTMENT REPRESENTATIVE:
   RICK POWELL
   OLD ORLAND CENTRE
   9763 WEST 143RD STREET
   ORLAND PARK     IL   60462

TO:
   NORTHSTAR BASEMENTS INC
   13603 S 85TH AV
   ORLAND PARK   IL 60462-1603

PHONE NUMBER: (708)460-0696
RECEIPT NUMBER: 3142

| DESCRIPTION | AMOUNT | CHECK/COUPON NUMBER |
|---|---|---|
| PERSONAL CHECK<br>   ANGELA WONNACOTT | 5,000.00 | 3618 |
| TOTAL: | $5,000.00 | |

THANK YOU FOR ALLOWING EDWARD JONES THE OPPORTUNITY TO SERVE YOU.

RECEIVED BY: _Victoria Karl_ (signature)

PAGE 01

**PHONE: 708-364-7681   www.rosscastlebuilders.com   FAX: 708-364-7501**

Dear Kirk

Robert Sam gave Ross Castle Builders a check numbered 1242 in the amount of $25,000 on or around May 21st. This check was post dated for June 02 2006 and was not to be deposited until Ross castle received direction from Robert Sam. This check was mistakenly deposited in Ross castle's bank account on May 23rd. This check was returned to Ross Castle because of insuffient funds.

_____
Liam o Connor



06/27/2006 15:54 NO.841 D03